UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

WALTER SWIFT,

     Plaintiff,

vs.

CITY OF DETROIT, a municipal corporation,
COUNTY OF WAYNE, a municipal corporation,
DETROIT POLICE SERGEANT ELIZABETH
LEWANDOWSKI, former DETROIT POLICE
OFFICER JANICE PAAVOLA/NOBLISKI, DETROIT
POLICE OFFICER RONALD BADACZEWSKI, JOHN
DOE 1 -3, current and/or former DETROIT POLICE
OFFICERS and RICHARD ROE 4 - 6, current and/or
former DETROIT POLICE SUPERVISORS, all acting in
their individual capacities,

     Defendants.

**COMPLAINT AND
DEMAND FOR JURY
TRIAL**

Case No.:
Honorable:

_____/

William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (71374)
*Attorneys for Plaintiff*
GOODMAN AND HURWITZ, P.C.
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170

Barry C. Scheck (NY ID No. 1634765)
Deborah L. Cornwall (NY ID No. 3924651)
Emma Freudenberger (NY ID No. 4624045)
*Attorneys for Plaintiff*
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
(212) 965-9081

_____/

1

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff WALTER SWIFT, by and through his attorneys and for his Complaint and Jury Demand, does hereby allege as follows:

## PRELIMINARY STATEMENT

1.  This is a civil rights action in which Plaintiff WALTER SWIFT, seeks relief for extraordinary and ongoing injuries stemming from Defendants' violation, under color of state law, of his rights, privileges and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of Michigan.

2.  Mr. SWIFT was arrested on September 16, 1982, and wrongfully convicted on November 10, 1982, for the home invasion rape and armed robbery of a pregnant Indian Village woman in the presence of her infant son.  Mr. SWIFT spent nearly twenty-six years in prison before evidence of gross misconduct surrounding the process through which he was arrested and convicted surfaced, causing a Wayne County Judge to vacate Mr. SWIFT's conviction.

3.  The deceit, concealment, dishonesty and other wrongful acts of the police officer defendants herein caused the victim to falsely and arbitrarily identify Mr. SWIFT and prevented the prosecution and the defense from learning that the "identification"– which was substantially the only evidence linking Mr. SWIFT to the crime–was both the product of undue suggestion and otherwise unreliable.

4.  The arresting officers and supervisors were not alone in causing Mr. SWIFT's wrongful

conviction.  A police laboratory analyst deliberately and knowingly withheld an exculpatory amended laboratory report from the prosecution and the defense that he knew or should have known could have provided significant exculpatory evidence. That report demonstrates that the results of ABO blood typing performed on stains from a bed sheet and from the robe worn by the victim during one of the rapes were not inconclusive, as suggested by the original, un-amended laboratory report produced to the prosecution and the defense, but instead excluded Mr. SWIFT.

5.   Lead investigator and supervisor Sergeant LEWANDOWSI further knew about the exculpatory amended lab report, and deliberately or knowingly withheld it from the prosecution and defense, despite the fact that she knew or should have known that it exculpated Mr. SWIFT.

6.   Individual Detroit Police defendants SERGEANT ELIZABETH LEWANDOWSKI, OFFICER JANICE PAAVOLA/NOBLISKI, OFFICER Ronald BADACZEWSKI, Defendants DOE 1 – 3 and Defendants ROE 4 – 6, acting individually, as well as jointly and severally, did cause WALTER SWIFT to be subjected to a violation of his constitutional rights under the Fourth and Fourteenth Amendments, amounting to an unlawful seizure of his person, by way of false imprisonment, withholding of exculpatory evidence, and malicious prosecution, all of which resulted in his incredibly unjust arrest, trial, conviction and imprisonment for twenty-six years for a crime which Defendants knew or had actual notice that he did not commit.

7.   The conduct of these Detroit Police Department officers was made possible by Defendant CITY OF DETROIT'S ("the City") policy, custom and practice of failing to

properly train and supervise police officers in their investigations, including in conducting and documenting identification procedures, avoiding manipulating and shaping the recollections of witnesses, preparing investigative reports, and disclosing exculpatory evidence. Had Detroit Police Department officers been properly trained and supervised, an innocent man would not have spent nearly 26 years of his life in prison.

8. The City was deliberately indifferent to the known and obvious consequences of its policies and customs regarding criminal investigations, which was that innocent men and women would be illegally and unjustly convicted by unduly suggestive and arbitrarily conducted identification procedures.

9. The unconstitutional conduct responsible for Mr. SWIFT's injuries was not limited to actions by the City and its police and laboratory personnel. Defendant COUNTY OF WAYNE ("the COUNTY") also caused Mr. Swift's conviction.

10. During and prior to the early 1980s the COUNTY, acting through its official policymakers, maintained an official policy and custom of failing to adequately fund its woefully inadequate system of indigent representation in serious felony cases. The COUNTY knew of this policy and custom, and implemented it with deliberate indifference to its known and obvious consequences: that the court-appointed defense bar assigned to represent indigent defendants in serious felony cases would lack the resources to mount serious defenses, specifically the funds to hire investigators to find, interview and prepare witnesses and/or experts to explain forensic evidence, and as a result, innocent citizens would be illegally and wrongfully convicted of crimes they did

not commit.

11.    Moreover, the illegal and unconstitutional conduct committed by Defendants

LEWANDOWSKI, PAAVOLA/NOBLISKI, and BADECZEWSKI, as well as John

DOE Officers and Richard ROE supervisors and defendants CITY OF DETROIT and

COUNTY OF WAYNE, not only sent an innocent man to prison for nearly twenty-six

years; it also allowed the real rapist to remain at large and free to commit more heinous

crimes.

12.    On May 21, 2008, Plaintiff WALTER SWIFT was finally exonerated and released from

prison after serving almost twenty-six years behind bars as an innocent man, during

which time he suffered incalculable harm.

13.    Through this action, Walter SWIFT seeks compensatory and punitive damages,

declaratory relief, an award of reasonable attorneys' fees and costs, and such other and

further relief as the Court deems proper.

14.    Beyond compensating Mr. SWIFT for the nearly twenty-six years that he spent in

prison and his ongoing extreme suffering, all directly attributable to the Defendants'

respective conduct–all committed pursuant to the customs policies and practices of the

Defendants CITY OF DETROIT and COUNTY OF WAYNE–this action seeks to

remedy the unlawful CITY OF DETROIT and WAYNE COUNTY policies, practices,

and customs of failing to adequately train and supervise its officers, and failing to

adequately fund its grossly inadequate system of indigent representation, respectively,

which led Defendants to violate Mr. SWIFT's constitutional rights as guaranteed by the

Fourth, Fifth and Fourteenth Amendments of the United States Constitution, and the

laws of the State of Michigan.

## JURISDICTION

15.   Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of plaintiff's federal constitutional and civil rights.

16.   Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

17.   Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

18.   Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

## JURY DEMAND

19.   Plaintiff demands a trial by jury in this action on each and every one of his claims.

## PARTIES

20.   Plaintiff WALTER SWIFT is a citizen of the United States, and was at all times relevant herein a resident of the County of Wayne, State of Michigan.

21.   Defendant CITY OF DETROIT ("CITY") is a municipal corporation, authorized under

6

and created by the laws of the State of Michigan. It is, and has been at all times relevant hereto, authorized by law to maintain and operate a Police Department.  By and through its agents, including but not limited to the Chief of Police, its supervisors, operating officers, Boards, Commissions and Committees and its final policymakers, Defendant CITY, at all times relevant hereto, established, promulgated and implemented the policies, written and unwritten, of the Detroit Police Department ("DPD"), with regard to hiring, training, supervision and discipline of the employees of said department, as well as the investigative practices and procedures of its Sex Crimes Unit and the officers who worked within that Unit.

22.  Defendant COUNTY OF WAYNE ("COUNTY") is a municipal corporation, authorized under and created by the laws of the State of Michigan. Through its agents, supervisors, operating officers, Boards and Committees and final policymakers, Defendant COUNTY establishes, promulgates and implements the policies regarding the assignment and compensation of defense counsel to indigent defendants in criminal cases.

23.  Defendant Sergeant ELIZABETH LEWANDOWSKI was at all times relevant herein a police officer acting within the scope of her authority and under color of law as a supervisor in the Sex Crimes Unit of the Detroit Police Department, a supervisor of Defendant Officer JANICE PAAVOLA/NOBLISKI and the DOE Defendants, and was the Officer In Charge of the investigation and subsequent arrest, prosecution and conviction of Plaintiff WALTER SWIFT.

24.  Defendant JANICE PAAVOLA/NOBLISKI, (formerly JANICE PAAVOLA,

7

2:10-cv-12911-BAF-RSW   Doc # 1   Filed 07/23/10   Pg 8 of 52   Pg ID 8

hereinafter referred to as PAAVOLA/NOBLISKI), was at all times relevant herein a police officer acting within the scope of her authority and under color of law as an officer within the Sex Crimes Unit of the Detroit Police Department, the original Officer In Charge of the investigation resulting in the arrest and subsequent prosecution of Plaintiff WALTER SWIFT, and testified at his criminal trial in that capacity.

25. Defendant Ronald BADACZEWSI was at all times relevant herein a police officer acting within the scope of his authority and under color of law as an officer within the Serology and Trace Evidence Unit of the Detroit Police Department Crime Lab, who tested evidence from the crime scene for the presence of blood, seminal fluid, and testified at Plaintiff's criminal trial in that capacity.

26. Defendants DOE 1-3 were at all times relevant herein Detroit Police officers acting within the scope of their authority and under color of law, and were directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights.

27. At all times relevant herein, the individual Defendants violated clearly established rights guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, rights of which a reasonable police officer and/or public official under these circumstances would have known, and of which in this case defendants were on actual notice.

**STATEMENT OF FACTS**

28. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 27 as if fully set forth herein.

29.   In the late morning hours of September 2, 1982, S.F.S.[1], a pregnant 35-year-old white woman, was the victim of a vicious home-invasion rape.

30.   S.F.S. was playing with her eight-month-old son on the floor of an upstairs bedroom when she was grabbed from behind by an unknown black male and dragged into the bedroom she shared with her husband, at which time her assailant raped her on her bed.

31.   After the first rape, the rapist allowed her to put on her robe and then led her downstairs where he again raped her on a rug on the floor.

32.   The rapist then told her to close her eyes and left the premises.

## FAILURE TO DISCLOSE
## PRIOR SEVEN PHOTO SELECTIONS

33.   The victim S.F.S. immediately described the rapist to investigating police officers simply as a black male of dark complexion, 15 to 18 years of age, with an unusual hairstyle: "very small braids," and "poofs of hair."  She affirmatively described him as not having any facial hair.

34.   By contrast, at that time, WALTER SWIFT was 21 years old, with a mature moustache, long sideburns, and shortly cropped hair.

35.   On September 10, 1982, eight days after the rape, the victim S.F.S. was contacted by Defendant PAAVOLA/NOBLISKI and asked to come to the Detroit Police Headquarters to look at photographs.

36.   At that time, the victim S.F.S. was shown hundreds of photographs, arranged in order of race, size and age.

---

[1] To protect the victim's privacy she is referred to herein by her initials "S.F.S.".

9

37. Prior to ever seeing a photograph of Plaintiff WALTER SWIFT, the victim S.F.S. selected seven (7) different photographs of seven (7) different men, indicating that each had features similar to her assailant, such as eyes, hair, or expression.

38. After the victim S.F.S. selected the photograph of the seventh man whom she said resembled, or had a feature similar to, her assailant, Defendant PAAVOLA/NOBLISKI, for reasons that were unclear even to her and remain so, arbitrarily decided that the next person the victim selected as having features similar to the perpetrator would be arrested and brought in for an in-person line-up identification.

39. This arbitrary, reckless and clearly dangerous decision was without probable cause, thus constituting deliberate indifference to the obvious likelihood that simply placing the next person the victim selected in this way in a line-up would lead to a misidentification.

40. The eighth photograph the victim pointed to was that of the plaintiff WALTER SWIFT. S.F.S. did not positively identify Mr. SWIFT as the perpetrator, but as with the previous seven photographs, said only that he had features "similar" to the perpetrator: in Mr. SWIFT's case, his eyes.

41. S.F.S. did not put any extra emphasis on WALTER SWIFT'S photograph as compared to the pictures of the seven (7) men she had previously said resembled her rapist.

42. The arbitrary, reckless and dangerous decision to bring the eighth individual selected in for a line-up was conscience-shocking, deliberately indifferent, and without probable cause or any reasonable basis, because:

10

    a.   Defendant PAAVOLA/NOBLISKI knew that it was improper to place somebody in a line-up on the sole basis of having one similar facial feature to the perpetrator;

    b.   Defendant PAAVOLA/NOBLISKI knew that it was improper to place Mr. SWIFT in a line-up when the victim said nothing new about his photograph that she had not said about seven other men; and

    c.   Defendant PAAVOLA/NOBLISKI knew that conducting a line-up after a weak photo selection would create the obvious risk of a misidentification.

43.   Defendant PAAVOLA/NOBLISKI knew that Plaintiff WALTER SWIFT was not the perpetrator of this crime, given the following facts (*see* **Paavola/Nobliski Affidavit, attached hereto as Exhibit A**):

    a.   The victim's original description of her assailant was vastly dissimilar to Plaintiff SWIFT's photograph, and therefore someone other than Plaintiff;

    b.   The victim selected seven (7) other African-American men's photographs immediately prior to selecting WALTER SWIFT's photograph, saying that their photographs also contained solitary features that were purportedly similar to those of her rapist, thereby rendering her selection of the Plaintiff meaningless; and

    c.   The victim at the time of her photographic selection of the Plaintiff, never positively identified WALTER SWIFT as the perpetrator of her rapes, but rather, merely stated that his eyes, as depicted in the photograph, were similar to the rapist's eyes.

11

44.    Defendant PAAVOLA/NOBLISKI nevertheless arranged to have the victim view a
       live line-up that included only Plaintiff WALTER SWIFT from amongst the eight (8)
       total men whose photographs she had pointed to as the possible rapist.

45.    Also, at some point prior to the line-up, Defendant PAAVOLA/NOBLISKI explicitly
       disclosed to the victim that SWIFT would be among the supposedly "anonymous"
       persons who would constitute the line-up.

46.    The pre-identification disclosure to the victim that Plaintiff WALTER SWIFT would
       be in the lineup, along with several other pre-identification actions taken by
       Defendants PAAVOLA/NOBLISKI, LEWANDOWSKI and others, all pursuant to
       Defendant CITY's customs, policies and practices, created an obviously and unduly
       suggestive bias in the victim S.F.S., virtually ensuring that she would misidentify Mr.
       SWIFT.

47.    Furthermore, the line-up Defendant PAAVOLA/NOBLISKI arranged was unduly
       suggestive on account of the fact that Plaintiff Walter SWIFT was one of only five
       individuals in the line-up, and was the only one in the line-up whose photograph
       S.F.S. had selected.

48.    Defendant PAAVOLA/NOBLISKI's unduly suggestive conduct irreparably tainted
       the victim's ability to remember what her actual rapist looked like and instead
       redirected her attention toward Mr. SWIFT.

49.    A reasonable police officer in Defendants PAAVOLA/NOBLISKI's and
       LEWANDOWSKI's shoes would have known that such suggestive conduct was
       unlawful and violated the Plaintiff's clearly established constitutional rights under the

Fifth, Sixth and Fourteenth Amendments, especially given the totality of the circumstances.

50. Predictably, the victim selected Mr. SWIFT at the line-up, albeit ambiguously. She stated only that she "believed" that he was her assailant, and therefore did not make a positive identification.

51. Despite the victim's statement, Defendant PAAVOLA/NOBLISKI was so skeptical of the identification that she told Plaintiff he was free to leave the police headquarters, and arranged for him to submit to a polygraph examination, scheduling it for the following week, after she, PAAVOLA/NOBLISKI, returned from her vacation.

52. The fact that Defendant PAAVOLA/NOBLISKI had scheduled a polygraph should have indicated to Defendant LEWANDOWSKI pursuant to the generally accepted police practice of making an arrest after a reliable identification that the identification was not, in fact, reliable.

53. However, two days after the line-up, while Defendant PAAVOLA/NOBLISKI was still on vacation, Defendant LEWANDOWSKI arbitrarily removed Defendant PAAVOLA/NOBLISKI from the case and took over responsibility for the alleged "investigation."

54. While Defendant PAAVOLA/NOBLISKI was still on vacation, Defendant LEWANDOWSKI cancelled the polygraph test that Defendant PAAVOLA/NOBLISKI had scheduled for Mr. SWIFT, obtained a warrant, and on September 16, 1982, had WALTER SWIFT arrested and charged with rape.

13

55. Plaintiff WALTER SWIFT was detained without bail following his arraignment on September 17, 1982 and through his trial.

56. September 16, 1982, was WALTER SWIFT's last day of freedom until May 21, 2008, nearly twenty-six years after he was first arrested.

57. When Defendant PAAVOLA/NOBLISKI returned from vacation, she was advised by Defendant LEWANDOWSKI that she had been removed from the case.

58. This was the only time Defendant PAAVOLA/NOBLISKI had ever been removed from a case in thirteen years working for the Detroit Police Department Sex Crimes Unit.

59. When Defendant PAAVOLA/NOBLISKI explained why she was not convinced that Mr. SWIFT was the perpetrator, Defendant LEWANDOWSKI stated that although Plaintiff SWIFT may not have done this crime, she was sure that he had committed some other crime before that he had gotten away with.

60. Defendant LEWANDOWSKI knew that Mr. SWIFT was placed in a line-up improperly on the basis of an unreliable photo selection, and knew that the victim had not made a positive identification at the line-up.

61. Defendant LEWANDOWSKI also knew or was on actual notice that the improper line-up, where the victim had been told that Walter Swift—whose photo was the 8th and last photo she had selected—would be appearing, was in and of itself unduly suggestive.

14

62.  Defendant LEWANDOWSKI therefore knew that there was not even arguably sufficient credible evidence to establish probable cause for Plaintiff's arrest, nor to charge him with this horrendous crime.

63.  Neither Defendants PAAVOLA/NOBLISKI nor LEWANDOWSKI ever disclosed to either the prosecutor's office or defense counsel that the victim had selected photographs of *seven* (7) other men before selecting Mr. SWIFT out of the lineup as the man who "may have" raped her.

64.  In both written and oral pretrial reports to the prosecutor, Defendants PAAVOLA/NOBLISKI and LEWANDOWSKI misrepresented the circumstances of the victim's unreliable identification.

65.  The prosecution thus relied on the victim's supposed  "identification" of Mr. SWIFT as the primary evidence against him, erroneously arguing to the jury that he was the *only* man she identified, to wit:

> "She doesn't look at one or two or three or four or five pictures, she looks at over five hundred pictures...  According to Officer Paavola [NOBLISKI].   And she goes through all those pictures and finally does not even finish the second stack but somewhere in the second stack of photos she sees the picture of WALTER SWIFT and indicates that is the individual. At that point Officer Paavola [NOBLISKI] takes the picture and arranges a show-up."

**(Excerpt of Peoples' Summation, attached as Exhibit B.)**

66.  Neither Defendants PAAVOLA/NOBLISKI, nor LEWANDOWSKI ever corrected this critically important misrepresentation of the facts.

67.  Indeed, and upon information and belief consistent with her pretrial communications with the prosecutor, Defendant PAAVOLA/NOBLISKI testified at Mr. SWIFT's

15

criminal trial that the victim had selected Mr. SWIFT's photograph from more than 500 photographs shown to her, without ever disclosing that the victim had also, at the same sitting, selected photographs of seven other men who, like Mr. SWIFT, allegedly had "similar features" to the man who had raped her.

68.   Aside from the victim's "identification," the prosecution relied on the testimony of Sheila Romano, a friend of the victim's who lived a few blocks away, that on the day of the attack she heard a noise at her back door and saw a black male crouched down jiggling the doorknob. Three weeks after catching a glimpse of this man behind her home, and after the victim had "identified" Walter SWIFT, leading to his arrest, Romano picked Plaintiff WALTER SWIFT out of a lineup, and later identified him in court. Romano also testified, however, that she did not observe Plaintiff's moustache or long sideburns on the man she saw.

69.   The prosecution also relied on testimony by DPD crime lab technician Officer Ronald BADACZEWSKI that preliminary tests conducted on stains found on the victim's robe and bed sheet were positive for both blood and seminal fluid, which the prosecution argued was evidence that was likely left by Walter SWIFT during the rapes.

70.   None of the Defendants herein, nor any of Defendant CITY's other agents, ever disclosed to any of the Plaintiff's criminal defense attorneys, to the Wayne County Prosecutor, or to any of the assistant prosecuting attorneys who worked on this case, that the victim had selected *seven (7)* other photographs as resembling her rapist/assailant *before* she selected a photograph of Plaintiff WALTER SWIFT.

16

71.   Indeed, the prosecutor was led to believe that Mr. SWIFT was the only person identified out of hundreds of photographs, and that the victim subsequently identified Mr. SWIFT again at a properly conducted line-up.

72.   The prosecutor thus used the victim's identification of Mr. SWIFT as the centerpiece of the prosecution.  Had Defendants disclosed the truth to him, the prosecutor would have been constitutionally, legally, ethically and professionally obligated to advise plaintiff WALTER SWIFT's attorneys (trial and appellate) of this critical and exculpatory evidence.  Indeed, if Defendants PAAVOLA/NOBLISKI or LEWANDOWSKI had disclosed the truth about the suggestive and unreliable circumstances of the victim's identification, the prosecution would have been duty-bound to abandon the entire prosecution against WALTER SWIFT.

## FAILURE TO DISCLOSE EXCULPATORY AMENDED LABORATORY REPORT

73.   On September 23, 1982, the prosecution provided Plaintiff's criminal defense counsel with one Laboratory Analysis Report, dated September 22, 1982.

74.   The September 22, 1982 report documented the results of serological testing performed on stains from the victim's robe and bed sheet, as well as testing performed on samples of Plaintiff's saliva and blood. (*See* **Original Lytle Report, Attached as Exhibit C**).

75.   That first lab report showed the presence of seminal fluid in the samples collected from the robe and the bed sheet, but indicated that no blood group substances were found in either stain.

17

76.  Because no blood group substances were detected, the lab report was silent as to the blood type of the rapist.

77.  In addition to testing stains on the robe and the bed sheet, the laboratory performed tests on saliva and blood samples from Plaintiff WALTER SWIFT, which showed that he was a "secretor"—someone whose blood group substances are present in (and therefore discernable from) their other bodily fluids, like semen, saliva, sweat and vaginal fluids—and that he was blood type O Rh+.

78.  Based on the information contained in the original September 22, 1982 report, an expert would have been able to discern two possible explanations of the evidence, either:

   a.  The victim was a "non-secretor" whose vaginal fluid was "masking" or obscuring the blood group substances present in the rapist's seminal fluid; or

   b.  The rapist, unlike Walter SWIFT, was a non-secretor.

79.  No samples of blood or saliva from the victim, S.F.S., had been tested at the time the original report was prepared, and it was therefore not known whether she was a secretor or a non-secretor.  As such, the original September 22, 1982 laboratory report neither inculpated nor exculpated WALTER SWIFT.  It simply did not exclude him as the source of the seminal fluid.

80.  On October 14, 1982, Defendant LEWANDOWSKI accompanied S.F.S.to the Serology Unit of the Detroit Police Crime Laboratory for the purpose of collecting samples of her saliva and blood.

81.  A Detroit Police Department laboratory serologist, Paula Lytle, subsequently prepared an amended laboratory report that included the results of the October 14, 1982 testing of the victim's saliva and blood.   **(*See* Amended Lytle Report, Attached as Exhibit D).**

82.  Testing on those samples showed that the victim was a "secretor," eliminating the possibility that her vaginal fluid simply "masked" the blood group substances present in the rapist's seminal fluid.  **(*See* 9/12/03 Letter from Paula Lytle to Niamh Murray, Attached as Exhibit E).**

83.  Because the victim was a secretor, her vaginal fluids could not have masked blood group substances present in the rapist's seminal fluid without the detection of any blood group substances from *her* secretions.  *See id.*

84.  The fact that no blood group substances were detected at all therefore confirmed that the rapist was in fact a "non-secretor."  *See id.*

85.  Based on the results of the subsequent testing on the blood and saliva samples from the victim, on October 14, 1982, and the fact that Mr. SWIFT was a "secretor," an expert would have been able to essentially *exclude* Mr. SWIFT as the rapist.  *See id.*

86.  In 1982, the police had a clearly established constitutional duty to disclose any and all evidence favorable to the defense.  At this time, Detroit Police Department practice was to turn over all pretrial discovery to the defense directly.

87.  However, neither the fact of the October 14, 1982 testing of the victim's saliva, nor the critically exculpatory amended laboratory report were ever disclosed to any of the

Plaintiff's criminal defense attorneys, to the Wayne County Prosecutor or to any of the assistant prosecuting attorneys who worked on the criminal case against Mr. SWIFT.

88.   Paula Lytle was never called to testify at the criminal trial.

89.   At trial, Defendant Ronald BADACZEWSKI testified that sperm was found on samples from both the robe and the bed sheet, but that he had no personal knowledge of the results of further serological testing conducted on that evidence because he had not performed the testing himself.

90.   Defendant BADACZEWSKI so testified despite the fact that he had in his possession the complete DPD laboratory file and therefore was on actual notice of the existence of Lytle's amended, exculpatory laboratory report which included the October testing results.

91.   Lytle's amended lab report was never even known to exist by anyone outside the Detroit Police Department until twenty-one years later, when it was uncovered as part of the post-conviction investigation that ultimately led to Plaintiff's exoneration and release.

92.   Had this exculpatory evidence been disclosed, it would have shown that Plaintiff WALTER SWIFT was not a viable suspect in the crime.

93.   Because Defendant LEWANDOWSKI personally escorted the victim, S.F.S., to the DPD laboratory on October 14, 1982, Defendant LEWANDOWSKI knew that samples of S.F.S.'s blood and saliva were taken.  These samples were taken by Paula Lytle in Defendant LEWANDOWSKI's presence.  Defendant LEWANDOWSKI was therefore in contact with Paula Lytle knew testing on the victim's blood and saliva

samples was being conducted, and would have received an oral report of the results from Lytle, as well as the amended laboratory report.

94.    As a consequence of Defendant LEWANDOWSKI escorting S.F.S. to the DPD laboratory, Defendant LEWANDOWSKI also had an opportunity to reinforce the victim's misidentification of Mr. SWIFT.

95.    Plaintiff WALTER SWIFT was unlawfully held in custody even after Defendant LEWANDOWSKI became aware that the serological testing on the samples retrieved from the scene of the rape excluded him as the source of the seminal fluid on the robe and the bed sheet.

96.    Mr. SWIFT was illegally held in pretrial custody from his arrest on September 16, 1982, through his conviction on November 10, 1982, and illegally imprisoned thereafter for twenty-five years, six months and twelve days, until May 21, 2008, when he was finally exonerated, his conviction was vacated, and he was released from prison.

97.    The individual Defendants' acts and omissions described above were intentional, wanton, willful and/or malicious, and were performed in violation of and with deliberate indifference to, and/or in reckless disregard for Plaintiff WALTER SWIFT's clearly established rights, as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

98.    At all times herein, Defendants LEWANDOWSKI, PAAVOLA/NOBLISKI, BADACZEWSKI and DOE 1-3 were acting under color of law, within the scope of their authority as law enforcement officers and pursuant to the customs, policies and

practices of Defendant CITY OF DETROIT.

99.   At all times herein Defendants DOE 1 -3 acted deliberately, knowingly, and directly in

concert with Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI and aided

and abetted said Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI in those

acts undertaken by them and complained of herein, all pursuant to the customs,

policies and practices of Defendant CITY OF DETROIT.

### THE CITY'S CUSTOM, PATTERN AND PRACTICE OF FAILING TO ADEQUATELY TRAIN, SUPERVISE AND DISCIPLINE DPD OFFICERS IN CONNECTION WITH FELONY INVESTIGATIONS

100.   It was the custom and policy of the Defendant CITY, by and through its final

policymakers, to authorize, ratify, condone, tolerate and approve illegal and

unconstitutional actions by Detroit Police Department officers, supervisors and

investigators.

101.   Those illegal and unconstitutional actions and practices included but were not limited to:

a.   Conducting inadequate investigations into serious crimes by making arbitrary arrests

in order to close cases quickly and affirmatively choosing not to develop or pursue

actual leads and evidence;

b.   Using unreliable, discredited and improper identification techniques like five-person

lineups;

c.   Engaging in unduly suggestive behavior and improperly documenting line-ups; and

d.   Ignoring their constitutional duty to disclose exculpatory evidence to prosecutors and

defense counsel, including the concealment of improper suggestion on the part of

officers conducting line-ups.

22

102.   Defendant CITY, by and through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate investigatory techniques, evidence collection and evidence disclosure.

103.   Through this custom and policy of failing to adequately train, supervise or discipline its officers, Defendant CITY abdicated its duty to ensure that officers would:

   a.   Conduct constitutionally adequate investigations;

   b.   Never fabricate inculpatory evidence;

   c.   Obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted;

   d.   Disclose to prosecutors and defense counsel material information favorable to criminal defendants such as Mr. SWIFT;

   e.   Follow the duties imposed by *Brady v. Maryland* and its progeny; and

   f.   Refrain from administering arbitrary and unduly suggestive identification proceedings.

104.   Defendant CITY, by and through its final policymakers, had actual notice of the DPD's failures to train, supervise and/or discipline its employees.  It failed to train and supervise them despite the obvious need, and although the CITY knew that it was foreseeable that their police officers would predictably confront these situations, and that as a result of the failure to train, supervise and/or discipline, constitutional violations would result.

23

105.   Because of these unconstitutional customs and policies maintained by Defendant CITY OF DETROIT, individuals such as Plaintiff Walter SWIFT were wrongfully arrested, convicted and imprisoned in violation of their constitutional rights.

## WAYNE COUNTY'S FAILURE TO ADEQUATELY FUND OR COMPENSATE ASSIGNED CRIMINAL DEFENSE COUNSEL IN CAPITAL CASE

106.   In 1982 in the CITY OF DETROIT, "capital," or "serious felony," cases[2] were heard in Detroit Recorder's Court, which is now a part of the Wayne County Circuit Court.

107.   By statute, the defendant WAYNE COUNTY was responsible for setting a budget for funding to indigent defenders and paying "reasonable compensation for services performed" in all felony and misdemeanor cases in the City of Detroit.  *See* MCL 775.16 (1980).

108.    Defendant COUNTY, by and through its final policymakers, the County Board of Commissioners, maintained a custom or practice of providing grossly inadequate funding to indigent defenders, such that criminal defense attorneys were unable to hire or consult with experts in even the most serious felony claims carrying penalties of up to life in prison.

109.   In 1982, at the time of Plaintiff WALTER SWIFT's trial, pursuant to the customs, policies and practices of Defendant COUNTY OF WAYNE, compensation rates for cases during trial were set at the same rate that had been in place since 1967, with no uniform standards or eligibility criteria for attorneys appointed to represent indigent criminal defendants.

---

[2] In the State of Michigan, due to the abolition of the death penalty, all criminal felony cases in which the accused could be sentenced to life in prison are referred to as "capital cases."

110. Defense attorneys in serious felony cases were paid $125 for the full preparation and investigation before a criminal trial—including all costs and all jail visits to the client—regardless of how much or how little time the attorney actually spent investigating and preparing the case.

111. Compensation for trial attorneys in serious felony cases was $150 for each day of trial, a rate that had not been changed since 1967 and was far lower than the market rates for experienced criminal defense attorneys in the Detroit area in 1982.

112. Assigned counsel were paid an additional $50 for attending the sentencing hearing in the event of a conviction.

113. Although the trial judges of the Recorder's Court, City of Detroit, approved a Revised Fee Schedule in April 1979 that would have, upon information and belief, tripled fees paid to attorneys assigned to represent indigent individuals accused of crimes in the Recorder's Court, the Wayne County Board of Auditors refused to budget for that schedule. (*See* June 1, 1983 Letter from Ted Mrozowski to Richard D. Dunn, Attached as Exhibit F.)

114. At his arraignment, Plaintiff WALTER SWIFT was assigned Mr. Lawrence Greene as his court-appointed attorney.

115. Pursuant to the policies, customs and practices of Defendant COUNTY, Mr. Greene was provided a flat fee of $125 for investigating and prepping this very serious felony case in which Mr. SWIFT was facing up to life in prison.

116. As of 1982, the compensation scheme for attorneys appointed to represent indigent criminal defendants in WAYNE COUNTY was widely known, including to the County's

final policymakers, to be severely inadequate, resulting in widespread ineffective representation by overburdened attorneys.

117.    For example, in 1981 several bar associations, including the Detroit Bar Association and the Recorder's Court Bar Association, filed an Application in the Supreme Court of Michigan for a Writ of Superintending Control arguing that the schedule of compensation for lawyers appointed to represent indigent defendants accused of crimes in the Wayne County Circuit Court and the Recorder's Court for the City of Detroit conflicted with the principles underlying the Constitutionally guaranteed right to counsel.  Recognizing that the judiciary had approved an increased fee schedule, the Court dismissed the lawsuit without prejudice provided that the new fee schedule was put into effect.  Upon information and belief, despite the Court's order, the County subsequently refused to pay any vouchers submitted for services in felony cases, rendering moot the judicial approval of the fee increase.

118.    Because of the Defendant COUNTY'S policies of grossly inadequate compensation rates, Mr. Greene could not afford to and therefore did not hire or request funds to consult with a single expert in the areas of forensic serology about the original laboratory report of the serological testing and analysis performed on the biological evidence from the crime scene in this case.  In order to do so, he would have had to pay an expert out of the $150 he received to compensate him for his time investigating and prepping the case, or apply to the court for extra funding, which he knew, based on the County's custom and practice of inadequately funding indigent defenders, was futile.

119.   An expert in forensic serology would have explained to Mr. Greene, based on the results reported in the original laboratory report, that if the victim S.F.S. was a secretor, Mr. SWIFT would have been ruled out as the perpetrator.

120.   Had he had such knowledge, Mr. Greene could have called Paula Lytle to testify and would have generated evidence to support the defense that testing by the Detroit Police Department on biological evidence from the crime scene definitively eliminated the plaintiff, WALTER SWIFT, as a suspect.

121.   Without the funding to consult with an expert in forensic serology, Mr. Greene was not able to present this critically exculpatory evidence to the jury, especially since he, like most public defenders, did not possess an adequate understanding of forensic serology on his own to probe beyond the results reported in the original laboratory report in order to adequately cross-examine Defendant BADECZEWSKI regarding the import of the forensic evidence.  (*See* Exhibit E).

122.   Because Mr. Greene did not possess a sufficient understanding of forensic serology on his own, and because he did not have adequate funds to consult with an expert, he was not aware of the potentially exculpatory nature of the results reported on the original laboratory report, and did not insist that Lytle be called as a witness.  Indeed, he *stipulated* to the admission of her report without conducting any cross examination whatsoever; he *waived* her appearance as a witness altogether.

123.   Ms. Lytle's testimony would have been exculpatory in that it would definitively have excluded Mr. Swift as a possible source of the semen or other fluids deposited by the real rapist, which were collected by Defendant BADECZEWSKI and analyzed by Lytle.

27

124.    Had there been sufficient funding to adequately prepare MR. SWIFT's defense, including the hiring of a serological expert, Mr. Greene would have known that the results reported on the original laboratory report were potentially exculpatory, he would have asked Defendant BADACZEWSKI whether the victim's secretor status had been determined; would have talked to Paula Lytle; and would have known that the victim was a secretor and that Lytle's take on the evidence was that because the victim was a secretor, Mr. SWIFT was excluded as the rapist.

125.    Defendant COUNTY, by and through its final policymakers, had actual notice of its persistently inadequate funding of representation in serious felony cases, yet, nonetheless continued to provide inadequate funding despite an obvious need for the provision of adequate funds for defense attorneys to, at a minimum, consult with experts.

126.    For example, on May 6, 1982, the Combined Executive Committee of both the Recorder's Court and the Third Judicial Circuit Court adopted a resolution—which Executive Chief Judge Richard Dunn sent to the Chairman of the Wayne County Board of Auditors on May 12, 1982—that "the present inadequate attorneys fee schedule jeopardizes the rights of accused persons to have legal counsel of average competence.  In recognition of existing fiscal conditions, this Committee is willing to wait a month for the Wayne County Board of Auditors to complete this study, but we are not prepared to accept inaction for a longer period of time."  (*See* May 12, 1982 Letter from Richard D. Dunn to Ted Mrozowski, Attached as Exhibit G.)  On June 1, 1982, the Wayne County Board of Auditors informed the judiciary that "In view of the current fiscal condition of the

28

County and the need for reductions and cutbacks, the Board of Auditors feels that it would be extremely inappropriate to increase the fees at this time." (*See* Exhibit F.)

127. Defendant COUNTY's policy of inadequately funding indigent defenders in serious felony cases so that defense attorneys would predictably confront situations in which exculpatory forensic results would not be presented at trial because defense attorneys would be unable to pay experts who could explain the science to enable cross-examination of police laboratory analysts at trial, was objectively unreasonable and highly likely to result in constitutional violations.

128. Mr. Greene further did not have sufficient funds to and therefore did not consult with any other experts, including but not limited to experts in the areas of eyewitness identification or crime scene investigation.

129. Defendant COUNTY's custom and policy, maintained by and through its final policymakers, of persistently inadequately funding its indigent defenders in serious felony cases deprived Mr. SWIFT of constitutionally adequate representation.

130. As a direct and foreseeable result of these lapses, WALTER SWIFT was convicted of a crime he did not commit, and lost 26 years of his life to Michigan prisons.

## DAMAGES

131. As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

29

a.  Deprivation of liberty for over 26 years;

b.  Personal and physical injuries;

c.  Pain and suffering;

d.  Severe mental anguish;

e.  Emotional distress;

f.  Extreme fear;

g.  Economic damages including loss of income;

h.  Infliction of physical illness and injury resulting from his confinement;

i.  Inadequate medical care; humiliation, indignities, and embarrassment;

j.  Degradation;

k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter -- his only child -- who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

n.  Damage to his relationship with his family, including but not limited to his parents -- who passed away while Plaintiff was in prison and never saw their son exonerated -- and his many siblings.

30

## CLAIMS

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983: 4TH, AND 14TH AMENDMENTS
### FALSE ARREST/FALSE IMPRISONMENT AND MALICIOUS PROSECUTION

132.  Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 131, as if fully set forth herein.

133.  By their conduct, as described herein, Defendants are liable to Plaintiff WALTER SWIFT under 42 U.S.C. § 1983, for the violation, under color of law, of his constitutional rights to be free from unreasonable searches and seizures of his person, in particular false imprisonment and malicious prosecution, under the Fourth and Fourteenth Amendments to the United States Constitution; and his constitutional right to be free from any deprivation of liberty without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

134.  At no time relevant herein, especially with the combined knowledge of the circumstances surrounding the victim's unreliable selection of Mr. SWIFT'S photo and the results of the serological testing conducted by the Detroit Police Department Crime Lab, did Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI have reasonable grounds to believe that Plaintiff WALTER SWIFT had committed this crime, based on all the facts known to them at the time and what a reasonable police officer would have believed under the same circumstances.

135.  For example, Defendant LEWANDOWSKI, an experienced police Sergeant, knew that the victim had not positively identified Mr. SWIFT either by photograph or in the lineup, and knew that Defendant PAAVOLA/NOBLISKI, the Officer-In-Charge who

conducted the identification proceedings believed that the identifications were unreliable and knew that the case had not been adequately investigated.  No reasonable police officer would have believed an unreliable identification generated under the circumstances presented here would provide probable cause to arrest.

136.   By her own admission, as reported by Defendant PAAVOLA/NOBLISKI, Defendant LEWANDOWSKI did not believe Mr. SWIFT had committed this crime, but proceeded with his arrest because she "was sure that he did some crime before and had gotten away with it."  (*See* **Exhibit A**).

137.   Nevertheless, LEWANDOWSKI had PAAVOLA/NOBLISKI taken off the case and ordered Mr. SWIFT's arrest.  No reasonable police officer would have believed it lawful to arrest a suspect for a crime knowing he was innocent, based on the suspicion that he had probably committed some other crime in the past and evaded punishment.

138.   Defendant PAAVOLA/NOBLISKI took no action to intervene and stop Mr. SWIFT's arrest beyond informing her direct supervisor, Defendant LEWANDOWSKI, about the flaws in the identification procedures and the deficient investigation.  Defendant NOBLISKI never took steps to report the improper identification procedures up the chain of command or to the prosecutors, despite knowing that Defendant LEWANDOWKI was going to continue with Mr. SWIFT's unconstitutional arrest, although she clearly could have and should have done so despite having been taken off the case.

139.   Under Michigan law, the statute of limitations for false arrest was equitably tolled through and until May 21, 2008, at which time Plaintiff SWIFT was exonerated and

his conviction was vacated.

140. At all times herein Defendants LEWANDOWSKI, PAAVOLA/NOBLISKI, BADACZEWSKI, DOES and ROES, did knowingly cause the State to initiate or continue a criminal prosecution against the Plaintiff, WALTER SWIFT.

141. As to that criminal prosecution:

   a. The prosecution was initiated or continued by Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI, acting without probable cause.

   b. There was not even arguably probable cause to initiate or continue said criminal prosecution in light of the following facts, of which Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI were aware:

      i. The victim, S.F.S., selected multiple photographs of other men with a facial feature resembling that of the perpetrator, before she selected Mr. SWIFT's photo on the same grounds, and there was therefore no basis for putting Mr. SWIFT in a line-up;

      ii. The line-up was unduly suggestive in that the victim was told ahead of time that WALTER SWIFT would be in the line-up;

      iii. The victim's purported "identification" of Mr. SWIFT at the line-up was in fact tentative and did not constitute a positive identification at all;

      iv. By the time officers requested  a warrant from the Wayne County Prosecutors Office to arrest plaintiff WALTER SWIFT, both Defendant LEWANDOWSI and Defendant PAAVOLA/NOBLISKI had admitted that they did not believe that Mr. Swift committed the rapes of S.F.S.; and,

     v.   The results of the serological testing conducted on biological evidence from the crime scene excluded Mr. Swift as the rapist.

    c.   The prosecution was the result of malice on the part of the aforementioned Defendants as evidenced by the fact that that while Defendant LEWANDOWSKI'S statement that she did not believe WALTER SWIFT had raped or assaulted S.F.S., but she was sure he had done something wrong before and therefore deserved to be prosecuted for the S.F.S. rapes.

    d.   After twenty-six years, on May 21, 2008, the prosecution ended in the Plaintiff's favor, when he was exonerated and all charges ultimately dismissed on a joint motion filed by Plaintiff and the Wayne County Prosecutor for relief from the original judgment of guilt entered in the aforementioned criminal case in 1982;

142.   At all times herein, each of the aforementioned defendants violated the Plaintiff's clearly established right to be free from arrest and prosecution without probable cause.

143.   As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

    a.   Deprivation of liberty for over 26 years;

    b.   Personal and physical injuries;

    c.   Pain and suffering;

    d.   Severe mental anguish;

e.   Emotional distress;

f.   Extreme fear;

g.   Economic damages including loss of income;

h.   Infliction of physical illness and injury resulting from his confinement;

i.   Inadequate medical care; humiliation, indignities, and embarrassment;

j.   Degradation;

k.   Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.   Restrictions on all forms of personal freedom and physical liberty  including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter—his only child—who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

n.   Damage to his relationship with his family, including but not limited to his parents—who passed away while Plaintiff was in prison and never saw their son exonerated—and his many siblings.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983: 5TH, AND 14TH AMENDMENTS**
**DENIAL OF DUE PROCESS**
**FAILURE TO DISCLOSE EXCULPATORY AND IMPEACHMENT EVIDENCE**

144. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 143, as if fully set forth herein.

145. Defendant police officers and investigators, including Defendants LEWANDOWSKI, PAAVOLA/NOBLISKI, BADACZEWSKI, and DOES 1-3 knowingly and deliberately failed to document and disclose to either the prosecutors or to defense counsel material exculpatory and impeachment information, as required by the Fifth and Fourteenth Amendments to the Constitution of the United States, to wit:

   a. That the victim, S.F.S., selected photographs of seven other men with a facial feature resembling that of the perpetrator before she selected Plaintiff's photo on the same grounds, and there was therefore no basis for putting Plaintiff in a line-up;

   b. That the line-up, in which the victim later picked out Plaintiff WALTER SWIFT, was unfair–indeed tainted–in multiple ways including because Defendant PAAVOLA/NOBLISKI informed the victim that of the eight photographs she had selected as resembling her rapist/assailant, *only one of them*, Plaintiff WALTER SWIFT, the last and eighth person selected by the witness, would be standing in the line-up;

   c. That the identification of Plaintiff WALTER SWIFT at the lineup by the victim was unsure and therefore not a positive identification;

146. Defendant LEWANDOWSKI, after she removed Defendant PAAVOLA/NOBLISKI from the case and admitted that Mr. SWIFT "may not have done the crime," further knowingly and deliberately failed to document and disclose to either the prosecutor or

36

defense counsel that the DPD Crime Lab Report had been amended to include the results of blood typing on blood and saliva samples from the victim, which confirmed that the rapist was a "non-secretor," and could not have been Plaintiff WALTER SWIFT, a "secretor."  (*See* **Exhibit D; Exhibit E).**

147.   Defendant BADACZEWSKI further knowingly and deliberately failed to document and disclose to either the prosecutor or defense counsel that the DPD Crime Lab Report had been amended to include the results of blood typing on blood and saliva samples from the victim, which confirmed that the rapist was a "non-secretor," and could not have been Plaintiff WALTER SWIFT, a "secretor."

148.   Had the aforementioned evidence been disclosed to the criminal defense, there is a reasonable probability that the result of the criminal proceeding against Plaintiff WALTER SWIFT would have been different, including but not limited to the probability that the prosecutor's office itself would have dropped or dismissed the baseless criminal charges against him.

149.   By failing to disclose the exculpatory facts about the line-up, the results of testing on the victim's blood and saliva samples, and the existence of the exculpatory amended laboratory report, Defendants violated the due process clause of the Fourteenth Amendment, as interpreted by *Brady v. Maryland*, 373 U.S. 83 (1963), and its clearly established pre-1982 progeny, which imposed an explicit duty on these Defendants to disclose all material exculpatory and impeachment evidence to both the prosecutors and the criminal defense counsel.

150. Defendants' intentional, malicious, bad-faith, and/or reckless failure to disclose this material exculpatory information to both the prosecutors and defense counsel deprived Mr. SWIFT of significant exculpatory and impeachment material that would have rendered any identification of the Plaintiff, WALTER SWIFT, meaningless and non-incriminatory.

151. As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

  a. Deprivation of liberty for over 26 years;

  b. Personal and physical injuries;

  c. Pain and suffering;

  d. Severe mental anguish;

  e. Emotional distress;

  f. Extreme fear;

  g. Economic damages including loss of income;

  h. Infliction of physical illness and injury resulting from his confinement;

  i. Inadequate medical care; humiliation, indignities, and embarrassment;

  j. Degradation;

  k. Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty  including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter—his only child—who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

n.  Damage to his relationship with his family, including but not limited to his parents—who passed away while Plaintiff was in prison and never saw their son exonerated—and his many siblings.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – *MONELL* CLAIM
### DEFENDANT CITY OF DETROIT

152.  Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 151, as if fully set forth herein.

153.  At all times herein the CITY, by and through its final policymakers, established, promulgated, implemented and maintained DPD customs, policies and/or practices of authorizing, ratifying, condoning, tolerating and approving illegal and unconstitutional actions by Detroit Police Department officers, supervisors and investigators.  Those illegal and unconstitutional actions included conducting inadequate investigations into serious crimes by making arbitrary arrests in order to close cases quickly and affirmatively choosing not to develop or pursue actual leads and evidence.  They also included the practices of using unreliable, discredited and improper identification techniques like five-

person lineups; engaging in unduly suggestive behavior and improperly documenting line-ups; and ignoring the constitutional duty to disclose exculpatory evidence to prosecutors and defense counsel, including by concealing improper suggestion on the part of officers conducting line-ups.

154. Defendant CITY, by and through its final policymakers, maintained a custom and policy of inadequately training, supervising, and/or disciplining officers concerning all of the practices identified in paragraph 153.

155. Defendant CITY, by and through its final policymakers, had actual or constructive notice of inadequate training and supervision in the areas identified in paragraph 153. Defendant CITY maintained those inadequate practices despite an obvious need for training and supervision in those areas, and despite the foreseeable risk that police would predictably confront these situations and, without adequate training and supervision, constitutional violations would result.

156. Defendant CITY was therefore deliberately indifferent to the known and obvious risk that its policies, customs, and practices of inadequate training and supervision would lead to constitutional violations of the type suffered by plaintiff Walter SWIFT.

157. Because of these unconstitutional customs and policies maintained by the CITY of Detroit, individuals such as Walter SWIFT were wrongfully arrested and convicted in violation of their constitutional rights.

158. Each of the aforementioned policies was instrumental and a driving force in the violations of rights sustained by WALTER SWIFT, as set forth herein.

159. As a direct and proximate result of the acts and conduct of the Defendants in the

initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

a.  Deprivation of liberty for over 26 years;

b.  Personal and physical injuries;

c.  Pain and suffering;

d.  Severe mental anguish;

e.  Emotional distress;

f.  Extreme fear;

g.  Economic damages including loss of income;

h.  Infliction of physical illness and injury resulting from his confinement;

i.  Inadequate medical care; humiliation, indignities, and embarrassment;

j.  Degradation;

k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty  including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter—his only child—who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

n.  Damage to his relationship with his family, including but not limited to his parents—who passed away while Plaintiff was in prison and never saw their son exonerated—and his many siblings.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – *MONELL* CLAIM
### DEFENDANT COUNTY OF WAYNE

160.  Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 159, as if fully set forth herein.

161.  At all times herein, Defendant COUNTY, by and through its final policymakers, maintained a custom or practice of providing grossly inadequately funding to its system of indigent representation, insofar as criminal defense attorneys such as Lawrence Greene who represented Plaintiff Walter SWIFT at trial, did not have the funds to hire or consult with experts in even the most serious felony claims carrying penalties of up to life in prison.

162.  Prior to and at all times herein, Defendant COUNTY, by and through its final policymakers, had actual or constructive notice of such failure to adequately fund its system of indigent representation for serious felony cases despite an obvious need for the provision of adequate funds for defense attorneys to consult with experts. Defendant COUNTY further knew it was foreseeable that defense attorneys would predictably confront situations in which the results of forensic testing could exculpate

a defendant but the attorney would be unable to pay an expert who could explain the proper questions to ask at trial.  Defendant COUNTY further knew that as a result of the failure to provide adequate funding for this purpose, constitutional violations would result.

163.   Defendant COUNTY's custom and policy, maintained by and through its final policymakers, of failing to adequately fund its system of indigent representation in serious felony cases deprived Mr. SWIFT of constitutionally adequate representation.

164.   As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

   a.  Deprivation of liberty for over 26 years;

   b.  Personal and physical injuries;

   c.  Pain and suffering;

   d.  Severe mental anguish;

   e.  Emotional distress;

   f.  Extreme fear;

   g.  Economic damages including loss of income;

   h.  Infliction of physical illness and injury resulting from his confinement;

   i.  Inadequate medical care; humiliation, indignities, and embarrassment;

   j.  Degradation;

k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.  Damage to his relationship with his daughter–his only child–who was two years old when Plaintiff went to prison, and twenty-seven years old when he was released.

n.  Damage to his relationship with his family, including but not limited to his parents–who passed away while Plaintiff was in prison and never saw their son exonerated–and his many siblings.

## FIFTH CLAIM FOR RELIEF
## FALSE IMPRISONMENT – STATE LAW

165.  Plaintiff incorporates paragraphs 1 through 164, as more fully stated above.

166.  That this court has jurisdiction over the allegations contained in this count under the equitable doctrine of pendent and supplemental jurisdiction, as the state tort claims alleged in this count arise from the same facts and circumstances underpinning Plaintiff's federal cause of action.

167.  Defendants LEWANDOWSKI'S and PAAVOLA/NOBLISKI'S actions arresting Plaintiff without probable cause and causing him to be held against his will constituted false imprisonment, as there was no lawful basis for such action.

168.  That this false imprisonment was malicious, willful, wanton, and demonstrated a reckless disregard for Plaintiff's rights.

169.  As a direct and proximate result of the acts and conduct of the Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI in the imprisonment of Plaintiff without probable cause, Plaintiff WALTER SWIFT has suffered serious damages, including but not limited to:

    a.  Deprivation of liberty;

    b.  Personal and physical injuries;

    c.  Psychological and emotional anguish, distress, pain and suffering;

    d.  Fear;

    e.  Economic damages including loss of income;

    f.  Degradation; and,

    g.  Restrictions of personal and physical freedom.

### SIXTH CLAIM FOR RELIEF
### MALICIOUS PROSECUTION – STATE LAW

170.  Plaintiff incorporates paragraphs 1 through 169, as more fully stated above.

171.  That this court has jurisdiction over the allegations contained in this count under the equitable doctrine of pendent and supplemental jurisdiction, as the state tort claims alleged in this count arise from the same facts and circumstances underpinning Plaintiff's federal cause of action.

172.  That the Defendants, LEWANDOWSKI, PAAVOLA/NOBLISKI and BADECZEWSKI did cause and further the issuance and maintenance of criminal charges against Plaintiff without probable cause, charging him with the offenses of

45

Breaking and Entering with Intent to Commit Criminal Sexual Conduct, contrary to MCL 750.110, two counts of First Degree Criminal Sexual Conduct, contrary to MCL 750.520b and Robbery, contrary to MCL750.530.

173. That the above charges were resolved in Plaintiff's favor in the Wayne County Circuit Court on Tuesday May 21, 2008, when the Wayne County Circuit Court dismissed all charges and discharged Plaintiff from all charges and custody.

174. The above-mentioned prosecution was instituted by the Defendant Officers maliciously, in bad faith, and without probable cause.

175. As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

   a. Deprivation of liberty for over 26 years;

   b. Personal and physical injuries;

   c. Pain and suffering;

   d. Severe mental anguish;

   e. Emotional distress;

   f. Extreme fear;

   g. Economic damages including loss of income;

   h. Infliction of physical illness and injury resulting from his confinement;

   i. Inadequate medical care; humiliation, indignities, and embarrassment;

j.  Degradation;

k.  Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.  Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

## SEVENTH CLAIM FOR RELIEF
## GROSS NEGLIGENCE – STATE LAW

176.  Plaintiff incorporates paragraphs 1 through 175, as more fully stated above.

177.  That the Defendants, LEWANDOWSKI, PAAVOLA/NOBLISKI and BADECZEWSKI in falsely arresting, falsely imprisoning and maliciously prosecuting Plaintiff did act in a manner that was grossly negligent in the following ways:

a.  These defendants knew that their actions, including failure to disclose, and indeed affirmatively concealing, information that clearly constituted exculpatory evidence;

b.  Despite this knowledge, these Defendants deliberately persisted in their failure to disclose and in concealing the exculpatory information and evidence;

c.  These Defendants well knew that their failure to disclose, and in fact concealing, the exculpatory evidence would harm the Plaintiff, in the ways set forth above;

d.  Notwithstanding the knowledge that their actions, as set forth above, would seriously harm the Plaintiff, these Defendants failed to take any action to prevent

47

that harm;

    e.  There was no reasonable law enforcement purpose served by the actions of the Defendants in failing to disclose, and in fact concealing the aforementioned exculpatory evidence;

    f.  Indeed, revealing and disclosing such evidence would have, in no way, weakened or undermined any reasonable or legitimate law enforcement purpose.

178.  Furthermore, Defendants LEWANDOWSKI and PAAVOLA/NOBLISKI improperly suggested to witnesses that they identify the alleged rapist as Plaintiff WALTER SWIFT, notwithstanding their knowledge that the Plaintiff was not the rapist and that such improper and false suggestions would lead to serious harm and injury to the Plaintiff.  These improper and false suggestions were undertaken despite the fact that there was no reasonable or legitimate law enforcement purpose served by these improper and false suggestions and actions.

179.  As a direct and proximate result of these grossly negligent acts and conduct of the Defendants, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

    a.  Deprivation of liberty for over 26 years;

    b.  Personal and physical injuries;

    c.  Pain and suffering;

    d.  Severe mental anguish;

    e.  Emotional distress;

f.   Extreme fear;

g.   Economic damages including loss of income;

h.   Infliction of physical illness and injury resulting from his confinement;

i.   Inadequate medical care; humiliation, indignities, and embarrassment;

j.   Degradation;

k.   Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

l.   Restrictions on all forms of personal freedom and physical liberty  including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

### EIGHTH CLAIM FOR RELIEF
### INTENTIONAL INFLICTION OF EMOTIONAL HARM – STATE LAW

180.   Plaintiff incorporates paragraphs 1 through 179, as more fully stated above.

181.   The Defendants, LEWANDOWSKI, PAAVOLA/NOBLISKI  and BADECZEWSKI in actions that failed to disclose exculpatory evidence, deliberately concealed exculpatory evidence and falsely suggested the identity of the Plaintiff as the rapist herein, when Defendants knew that not to be the case, were intentional and directed at the Plaintiff, in the following particular respects, among others:

a.   They were designed to result in the arrest, prosecution, conviction and long term imprisonment of Plaintiff, despite the fact that these Defendants knew that the Plaintiff was not guilty of the alleged rape;

49

    b.   The actions of the Defendants were so reckless as to deliberately inflict emotional damage on the Plaintiff;

    c.   The actions of the individual Defendants were in avoidance of the Governmental Immunity Act, MCLA §691.1406, et seq.

182.   As a direct and proximate result of these grossly negligent acts and conduct of the Defendants, Plaintiff WALTER SWIFT has suffered severe damages, many of which effects continue to plague Mr. SWIFT to this day and will plague him for the rest of his life, including but not limited to:

    a.   Deprivation of liberty for over 26 years;

    b.   Personal and physical injuries;

    c.   Pain and suffering;

    d.   Severe mental anguish;

    e.   Emotional distress;

    f.   Extreme fear;

    g.   Economic damages including loss of income;

    h.   Infliction of physical illness and injury resulting from his confinement;

    i.   Inadequate medical care; humiliation, indignities, and embarrassment;

    j.   Degradation;

    k.   Permanent loss of natural psychological development, including the onset of traumatic mental illness; and

    l.   Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational

opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all defendants:

(a) A declaration that Defendants violated the federal rights of Plaintiff pursuant to 28 U.S.C. § 2201;

(b) A declaration that Plaintiff was actually innocent of the rape for which he was convicted pursuant to 28 U.S.C. § 2201;

(c) Compensatory damages for physical, emotional, and economic injuries suffered by plaintiff by reason of defendants' unlawful and unjustified conduct, in an amount fair, just and reasonable and in conformity with the evidence at trial;

(d) Punitive and exemplary damages against the individual defendants to the extent allowable by law;

(e) Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

(f) The costs and disbursements of this action pursuant to 42 U.S.C. § 1920; and

(g) Such other and further relief as appears just and proper.

Respectfully submitted,

GOODMAN & HURWITZ, P.C.

s/William H. Goodman_____
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (71374)

51

1397 Jefferson Ave,
Detroit, Michigan 48207
(313) 567-6170

-and-

NEUFELD SCHECK & BRUSTIN, LLP
Barry C. Scheck
Deborah L. Cornwall
Emma Freudenberger
99 Hudson Street, 8th Floor
New York, NY 10013
(212) 965-9081

*Attorneys for the Plaintiff*

Dated:  **July 23, 2010**